J-S11001-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF:  K.L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF:  S.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1508 WDA 2024 |

Appeal from the Order Entered November 6, 2024
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000239-2023

| | | |
|---|---|---|
| IN THE INTEREST OF:  M.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF:  S.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1509 WDA 2024 |

Appeal from the Order Entered November 6, 2024
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000238-2023

BEFORE:  MURRAY, J., KING, J., and LANE, J.

MEMORANDUM BY MURRAY, J.:                    **FILED: MARCH 31, 2025**

S.C. (Mother) appeals from the orders granting the petitions filed by the Allegheny County Office of Children, Youth, and Families (CYF), and involuntarily terminating Mother's parental rights to her daughters, K.L. (born

in April 2015) and M.M. (born in October 2022) (collectively, Children).[1] Upon careful review, we affirm.

The family came to CYF's attention in October 2022, after receiving a report that M.M. tested positive for fentanyl and methadone at birth. N.T., 10/31/24, at 19-20. During her initial assessment with a CYF case worker, Mother admitted to consuming illicit substances during her pregnancy, although she denied using fentanyl. *Id.* at 20, 22. CYF obtained an emergency custody authorization, and Children were placed in a foster home,[2] where they have remained since shortly after M.M.'s birth. *Id.* at 21.

On November 22, 2022, the trial court adjudicated Children dependent. The trial court further ordered Mother to undergo a drug and alcohol assessment and submit to random drug screens. *Id.* The trial court granted Mother supervised visitation with Children, which could progress to periods of unsupervised visitation by agreement of CYF. Order of Adjudication, 11/22/22, at 2.

---

[1] C.L., biological father of K.L., and C.M., putative father of M.M., are both deceased. Mother claimed another individual is the biological father (unknown father) of M.M. The trial court terminated unknown father's parental rights to M.M., and he is not a party to the instant appeal.

[2] Children's foster parents (Foster Parents) are a pre-adoptive resource. N.T., 10/31/24, at 75.

Mother was placed on supervision on an unspecified date, for federal drug charges.[3] On June 9, 2023, Mother's federal probation was revoked due to her continued drug use, and Mother was remanded to the Butler County Jail, until she was released in February 2024. N.T., 10/31/24, at 25, 28, 29.

On December 15, 2023, CYF filed petitions to involuntarily terminate Mother's parental rights to Children (TPR petitions), pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). CYF alleged, *inter alia*, that "Mother[] is unable to parent [Children,] as she has failed to comply with, or make sufficient progress on, the goals/outcomes established for her by []CYF or in court orders." TPR Petition (K.L.), 12/15/23, at 3; TPR Petition (M.M.), 12/15/23, at 3-4.

On October 31, 2024, the matter proceeded to a contested TPR hearing. Mother attended the hearing, represented by counsel. Children were not present, but were represented by separate legal counsel.[4] Pertinently, CYF

_____

[3] The October 31, 2024, termination of parental rights (TPR) hearing transcript discloses that, at various points throughout the life of Children's dependency cases, Mother was on pretrial supervision, probation, and parole for federal drug charges. *See* N.T., 10/31/24, at 28, 29, 89, 118, 165.

[4] On June 24, 2024, the trial court appointed a guardian *ad litem* (GAL) to represent the legal interests and best interests of M.M. *See* Order Appointing GAL, 6/24/24, at 1. As M.M.'s legal interests were unascertainable due to M.M.'s young age, no conflict existed between M.M.'s legal interests and best interests. *See In re Q.R.D.*, 214 A.3d 233, 240 (Pa. Super. 2019) ("[I]f the preferred outcome of a child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests." (citation omitted)).
*(Footnote Continued Next Page)*

presented the testimony of CYF case worker Rhianna Diana (Ms. Diana); Allegheny County Health Department drug and alcohol screening supervisor Tarraca Jackson (Ms. Jackson); Every Child foster care case worker Kristi Breighner (Ms. Breighner); and licensed psychologist Terry O'Hara, Ph.D. (Dr. O'Hara). Mother testified on her own behalf.

Ms. Diana testified that she was the family's case worker from October 2022 to February 2024. N.T., 10/31/24, at 15, 24. In addition to Mother's court-ordered goals of completing drug and alcohol treatment and submitting to random drug screens, Ms. Diana explained that Mother was ordered to work with housing services, complete parenting classes, and resolve her criminal charges. *Id.* at 21.

Ms. Diana testified that Mother did not complete a parenting program due to her June 2023 incarceration. *Id.* at 22. *But see id.* at 137 (CYF casework supervisor Patrick Houy (Mr. Houy) testifying that Mother completed a parenting class in April 2024 – approximately four months after CYF filed its TPR petitions). Further, although Mother completed a drug and alcohol evaluation at the onset of Children's dependency cases, Ms. Diana testified that Mother declined to participate in the recommended inpatient treatment because she did not believe she could engage in that level of care and maintain

---

On June 25, 2024, the trial court appointed counsel to represent the legal interests of K.L. *See* Order Appointing Legal Counsel, 6/25/24, at 1. The same order also made a finding that "no conflict exists" with respect to K.L.'s interests. *Id.*

employment and consistent visitation with Children. *Id.* at 23; *see also id.* at 23, 48 (Ms. Diana testifying that Mother "accepted a lower level of care[,]" but did not follow through on treatment); Order, 11/22/22, ¶ 29 (the trial court requiring Mother to participate in drug treatment at the "recommended level[] of [] treatment"). Ms. Diana testified that around June 2023, Mother's probation officer advised her that Mother had completed a 30-day inpatient drug and alcohol treatment/rehabilitation program. *Id.* at 35, 38-39. Ms. Diana explained, however, that CYF continued to have concerns regarding Mother's substance abuse, as Mother relapsed days after completing the inpatient program. *Id.* at 46.

Ms. Diana testified that Children view Foster Parents as parental figures, and rely on Foster Parents for love, care, and support. *Id.* at 32-33. Ms. Diana testified that Foster Parents attend to the medical and mental health needs of Children. *See id.* at 33 (Ms. Diana testifying Foster Parents "appropriately manage[]" M.M.'s asthma, and "have done a great job [e]nsuring that [K.L.] has the therapy that she needs [for treating her anxiety.]").

Ms. Diana testified that a primary source of K.L.'s persistent anxiety centered on Mother:

> [K.L.'s] biggest concern [she expressed] was going back home [with Mother], not having enough at [Mother's] home, whether that was in terms of various items, [such as] food, and being concern[ed] that [Mother] would leave [Children] again and just [Mother's] overall safety.

- 5 -

*Id.* at 34; *see also id.* at 42 (Ms. Diana testifying that K.L. experienced anxiety concerning visits and phone calls with Mother, and "around any conversation regarding [Mother] and any conversation [regarding] leaving [Foster Parents].").

Ms. Jackson testified that she supervised Mother's random drug screens. *Id.* at 56. Ms. Jackson indicated that Mother submitted to 23 drug screens, but failed to appear for 33. *Id.* Ms. Jackson testified that, of Mother's 23 drug screens, two tested positive for cocaine. *Id.* at 60.

Ms. Breighner testified that she has supervised Mother's visitation with Children since Children's initial placement in foster care. *Id.* at 61. Ms. Breighner testified that K.L. "has been very vocal for the past nine months that she wishes to be adopted [by Foster Parents] and remain in the foster home." *Id.* at 65-66. Although K.L. loves Mother, Ms. Breighner explained that K.L.

> has reported on multiple occasions to me … that she's scared things will, [] "get bad again at home." [K.L.] has also expressed to me that she is worried about [M]other's future [romantic] partners. [K.L.] has expressed that she has never felt comfortable around [M]other's paramours before, and she was worried that [M]other might have future paramours. [K.L.] also has expressed that she's afraid that she'll have to take care of [M.M.]

*Id.* at 66; *see also id.* at 68 (Ms. Breighner testifying that K.L.'s "anxiety drastically decrease[d]" while Mother was incarcerated, and K.L. "was exhibiting pretty typical child behaviors throughout that time period.").

Regarding Foster Parents' bond with Children, Ms. Breighner testified as follows:

> [C]hildren are very bonded to [] Foster Parents. [M.M.] is significantly bonded to [] Foster Parents. At this point in time, Foster Parents are the primary caregivers and pretty much the only caregiver[s] that [M.M] acknowledges. [K.L.], throughout her time being placed with [] Foster Parents, I've watched her bond grow significantly with them. [C]hildren appear very comfortable. I've observed them seek out [] Foster Parents for comfort, care, meeting their needs, anything along those lines. … [Children] are both willing to express their affection on their own towards [] Foster Parents[,] as well as accept it when [] Foster Parents express affection towards them.

*Id.* at 74 (paragraph break omitted; some capitalization modified); ***see also***

*id.* at 75 (Ms. Breighner opining that "it would be significantly detrimental to [C]hildren if they were removed from [F]oster [P]arents' care.").

Dr. O'Hara testified regarding interactional evaluations he conducted between Children and Mother, and between Children and Foster Parents. ***Id.*** at 88. Dr. O'Hara explained that "[a]t the time of these evaluations, I didn't have evidence that [Mother] was in a position to care for [C]hildren's psychological needs and welfare." ***Id.*** at 92. Dr. O'Hara continued:

> It's very difficult to prioritize a child's psychological needs and welfare if [a parent] is struggling with substance use concerns. … It's very, very difficult for a [parent] to be able to prioritize the stability necessary for a child developmentally. And I think that also relates to attachment. It's difficult for a child to be able to consider a caregiver as a consistent and reliable source of support, emotional support, if that caregiver is not able to be consistently responsive to the child's psychological needs.

***Id.*** at 93.

Concerning Foster Parents' relationship with Children, Dr. O'Hara testified that Children displayed an attachment to Foster Parents, and he did not have any concerns about Foster Parents' ability to care for Children. *Id.* at 96, 98. Dr. O'Hara testified that Children were "benefitting from the parenting skills and stability" provided by Foster Parents. *Id.* at 97; *see also id.* (Dr. O'Hara testifying that he "would have concerns if [C]hildren were uprooted from a scenario of safety and stability without being able to enter into another context of safety [and] stability …."").

Dr. O'Hara acknowledged that K.L. would suffer "some detriment" if her relationship with Mother were terminated, but explained "that detriment should [] be weighed against the approximate one year of lack of contact between [K.L.] and [M]other when [Mother] was incarcerated." *Id.* at 104; *see also id.* (Dr. O'Hara testifying that "there would be significant detriment to [K.L.] if her relationship with [F]oster [P]arents were to be severed.").

At the conclusion of the TPR hearing, the trial court adjourned the hearing, indicating that it would announce its decision in open court the following day. On November 1, 2024, the trial court rendered its decision,[5] terminating Mother's parental rights to Children, pursuant to 23 Pa.C.S.A. §

---

[5] The trial court's orders terminating Mother's parental rights to Children were not entered on the court docket until November 6, 2024.

- 8 -

2511(a)(2), (8), and (b).[6] Mother filed timely notices of appeal and contemporaneous Pa.R.A.P. 1925(a)(2)(i) statements.[7] The trial court filed a statement in lieu of opinion, relying on the rationale it set forth at the conclusion of the November 1, 2024, hearing.

Mother raises the following issues:

1. Did the trial court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S.[A.] §[ ]2511(a)(2) and (8)?

2. Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of [Children] pursuant to 23 Pa.C.S.[A.] §[ ]2511(b)?

Mother's Brief at 8 (unpaginated).

We review the termination of parental rights for an abuse of discretion. *See Interest of K.T.*, 296 A.3d 1085, 1104 (Pa. 2023). This standard of review requires appellate courts to

> accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

---

[6] The trial court did not rule on CYF's request to terminate Mother's parental rights pursuant to Section 2511(a)(5).

[7] This Court, *sua sponte*, consolidated Mother's appeals.

As the Pennsylvania Supreme Court discussed in *In re: R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010), there are clear reasons for applying an abuse of discretion standard of review…. Unlike trial courts, appellate courts are not equipped to make fact-specific determinations on a cold record, where trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead, we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*Interest of K.T.*, 324 A.3d 49, 56 (Pa. Super. 2024) (brackets omitted)

(quoting *In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012)).

Termination of parental rights is governed by Section 2511 of the

Adoption Act, which requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [Section] 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [Section] 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Matter of Adoption of L.C.J.W.*, 311 A.3d 41, 48 (Pa. Super. 2024) (citation

omitted). The standard of "clear and convincing" evidence is defined as

"evidence that is so clear, direct, weighty, and convincing as to enable a trier

of fact to come to a clear conviction, without hesitance, of the truth of the

- 10 -

precise facts in issue." ***Int. of R.H.B.***, 327 A.3d 1251, 1256 (Pa. Super. 2024) (quotation marks and citation omitted). Finally, this Court need only agree with the trial court as to "any one subsection of [Section] 2511(a), in addition to [Section] 2511(b), in order to affirm the termination of parental rights." ***Int. of M.E.***, 283 A.3d 820, 830 (Pa. Super. 2022) (citation omitted).

Instantly, we address the trial court's termination of Mother's parental rights under Section 2511(a)(8), which provides:

> **(a) General rule--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * *
>
> (8) The child has been removed from the care of the parent by the court …, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(8).

Concerning Section 2511(a)(8), Mother argues that she

> has remedied the conditions that led to the removal of [Children] as a result of her participation in substance abuse programs and a [] parenting class. Mother maintains her sobriety by utilizing the skills she acquired in her substance abuse treatment[ programs]. She has learned coping skills and has identified how her grief and trauma history can affect her.

Mother's Brief at 23-24 (unpaginated) (record citation omitted).

To satisfy the requirements of Section 2511(a)(8), the petitioner must prove: (1) the child has been removed from the parent's care for at least 12

months; (2) the conditions which led to the removal or placement still exist; and (3) termination of parental rights would best serve the needs and welfare of the child. *See In re Adoption of J.N.M.*, 177 A.3d 937, 943 (Pa. Super. 2018). Section 2511(a)(8) "authorizes the trial court to terminate parental rights if the parent has not resolved the conditions which led to placement …." *Int. of R.R.D.*, 300 A.3d 1077, 1082 (Pa. Super. 2023). The statute does not require that the court evaluate a parent's willingness or ability to remedy the conditions that led to the child's removal or placement. *See In re M.A.B.*, 166 A.3d 434, 446 (Pa. Super. 2017).

We have explained:

> By allowing for termination when the conditions that led to removal continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. This Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future.

*In re J.F.M.*, 71 A.3d 989, 997 (Pa. Super. 2013) (citation omitted).

Further,

> while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as prescribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*In re C.L.G.*, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*).

Instantly, the trial court determined that CYF established by clear and convincing evidence that termination of Mother's parental rights was warranted pursuant to Section 2511(a)(8):

> [C]hildren were removed [from Mother's care] and entered placement in early October of 2022. … We are now at the end of October [of 2024] … and so two years have gone by at this point. But at the time the [TPR petitions were] filed last December, more than a year had gone by. So that first [element of Section 2511(a)(8)] is met.
>
> The conditions which led to removal or placement of [Children] continue to exist. [W]hen I conducted the [dependency] hearing regarding [Children], … I listened to the evidence and defined what I considered were the conditions that made it necessary for [C]hildren to be in placement.
>
> The most relevant [condition] was [Mother's] need to engage in recommended levels of drug and alcohol treatment and establish and maintain recovery. [R]egarding [Mother], on December 15, 2023, she had not fully addressed the conditions that required [Children's] placement. Those conditions, as supported by the evidence, continue to exist. [Mother] was incarcerated at the time related to drug offenses. Although there absolutely were times that [Mother] engaged in drug and alcohol treatment, as of December 15[,] 2023[,] she had not both established and maintained recovery[,] and clearly had not demonstrated that ability in an unsupervised community setting[,] as she was incarcerated [for over nine months].

N.T., 11/1/24, at 7-9 (some paragraph breaks omitted).

Upon review, the trial court's factual findings are supported by the record, and we discern no abuse of discretion. *See Interest of K.T.*, 324 A.3d at 56. It is undisputed that Children had been placed with Foster Parents for more than a year when CYF filed its TPR petitions. The testimony elicited at the October 31, 2024, TPR hearing amply supports the trial court's

conclusion that the conditions necessitating Children's placement persist. Mother failed to appear for more than half of her court-ordered drug screens, and used illicit substances throughout the life of Children's dependency cases. N.T., 10/31/24, at 29, 56, 60. Further, Mother did not complete a parenting class until approximately four months **after** CYF filed its TPR petitions. **See In re Z.P.**, 994 A.2d 1108, 1121 (Pa. Super. 2010) ("[W]e may not consider any effort by the parent to remedy the conditions described in subsections (a)(1), (a)(6) or (a)(8) if that remedy was initiated after the parent was given notice that the [TPR] petition had been filed." (citation omitted)); **see also** N.T., 10/31/24, at 137 (Mr. Houy testifying that Mother did not complete a parenting class until April 2024).

As the conditions that required Children's placement continue to exist, we cannot conclude that the trial court erred in determining that CYF proved, by clear and convincing evidence, that termination was warranted pursuant to Section 2511(a)(8). Accordingly, Mother's first issue merits no relief.[8]

Mother next argues the trial court improperly terminated her parental rights under Section 2511(b). Mother points to Dr. O'Hara's testimony that he observed Mother exhibit positive parenting skills, and that there would be some detriment to Children if their bond with Mother was severed. **See**

_____

[8] Because we agree with the trial court that CYF met its burden with respect to Section 2511(a)(8), we need not address Mother's challenge to termination pursuant to Section 2511(a)(2). **See Int. of M.E.**, 283 A.3d at 830.

- 14 -

Mother's Brief at 25 (unpaginated). As a result, Mother argues, termination of Mother's parental rights "is not best for [Children's] needs and welfare." *Id.* at 26 (unpaginated).

When the trial court finds grounds for termination under Section 2511(a), it must separately consider a child's needs and welfare:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

"Notably, courts should consider the matter from the child's perspective, placing [their] developmental, physical, and emotional needs and welfare above concerns for the parent." *Interest of K.T.*, 296 A.3d at 1105. Courts must also "discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted). However, "the parental bond is but one part of the overall subsection (b) analysis." *Id.* at 1113.

> The Section 2511(b) inquiry must also include consideration of other important factors such as: the child's need for permanency and length of time in foster care …; whether the child is in a preadoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and

- 15 -

emotional needs, including intangible needs of love, comfort, security, safety, and stability.

*Id.* (footnote and citations omitted).

Instantly, the trial court addressed Children's needs and welfare, pursuant to both Section 2511(a)(8) and (b), as follows:

[M]y conclusion, based on the evidence that I've heard, is that it does best meet [C]hildren's needs and welfare for [M]other's rights to be terminated.

Regarding [M.M.], who is only two years old, while I recognize tha[t] Dr. O'Hara opined that [M.M.] has an attachment to [M]other, she clearly has a secure and strong attachment to [Foster Parents,] who have been raising her almost since birth. So from [M.M's] perspective, [Foster Parents] are the people who have provided her with care, affection, [and meet] her needs. [Foster Parents] are the people who are the reliable presence in [M.M.'s] life, and it would be … devastating to her to be removed from [Foster Parents'] care.

And any bond that [M.M.] has established with [M]other, I believe … [M.M. is] still too young to understand the loss of it, but at some point later on when she might feel it, I think that [Foster Parents] are very well[-]suited to help her understand and cope with any detriment to her from the loss of the relationship with [M]other.

Regarding [K.L.,] who's older, it is a little more complicated, but I think the evidence fully supports the conclusion that [K.L.'s] needs are served by this decision as well. It's clear that [K.L.] loves [M]other. It's also clear that she's developed a very strong bond with [Foster Parents,] where she is extremely well cared for….

… I heard evidence that K.L. experiences a significant amount of anxiety, particularly given her age, and that much of [her anxiety] is related to [M]other's circumstances[,] and perhaps fears about what may happen to [M]other, perhaps fears for herself if she were to return to [M]other.

- 16 -

> … Dr. O'Hara's testimony [] was pretty important to me both in stressing how important it is that [K.L.] have a secure and reliable presence in her life, which [are Foster Parents], and what the impact on [K.L.] probably has been [due to] the resumption of visits with [M]other that occurred in the spring[,] and then the unexplained disappearance of [M]other this summer ….
>
> ….
>
> I will note as well … that [Mother] was candid about the fact that she experienced a relapse this summer … [that] lasted a good six, seven weeks, July and most of August. And as [Mother] herself recognized, she's not in a position today to provide care for [C]hildren. So as I said, given all of that, it is clear to me that [termination of Mother's parental rights] meets [C]hilden's needs and welfare ….

N.T., 11/1/24, at 9-12 (some paragraph breaks omitted).

The reasoning and determination of the trial court are supported by the record and free of legal error. *See Interest of K.T.*, 324 A.3d at 56. During the more than two years that Children have been in the care of Foster Parents, Mother has been unable to demonstrate an ability to abstain from drug use and care for Children. The record supports the trial court's finding that the mere existence of a parental bond between Mother and Children did not outweigh Children's need for permanence, and that termination serves Children's best interests. *See Interest of K.T.*, 296 A.3d at 1113; *see also In re J.F.M.*, 71 A.3d at 997 ("This Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." (citation omitted)). We discern no abuse of discretion in the trial court's determination that termination is warranted pursuant to Section 2511(b).

- 17 -

Orders affirmed.

Judge Lane joins the memorandum.

Judge King concurs in the result.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 3/31/2025